cr5-100.dd.gaston 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-95-00100-CR







Arnold Ray Gaston, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF LLANO COUNTY, 33RD JUDICIAL DISTRICT


NO. 4591, HONORABLE CLAYTON E. EVANS, JUDGE PRESIDING







PER CURIAM


 Arnold Ray Gaston was convicted of murdering his wife, Valita Gaston, and
sentenced to thirty-five years' imprisonment and a $10,000 fine. We will affirm the judgment.

 There is no dispute that the eighty-year-old Gaston got his gun, drove to the
Calvary Hills Church in Kingsland, walked calmly into the fellowship hall, spoke briefly, pointed
the gun at Valita's head, and shot her to death. He tried to shoot others, but the gun failed to fire.

 Gaston was indicted for murder. His truck, which he drove to the church when
he killed Valita, was forfeited before he came to trial on the indictment. In relation to this action,
he filed a special plea of jeopardy, a motion to dismiss for double jeopardy, and an application
for writ of habeas corpus. The trial court rejected these and proceeded to trial.

 Gaston asserts four points of error. He contends that the trial court erred by not
charging the jury on voluntary manslaughter and involuntary manslaughter, by admitting certain
hearsay statements, and by rejecting his double-jeopardy claims in his writ of habeas corpus and
special plea. We find no harmful error in any of these contentions.



No Double Jeopardy


 By point of error four, Gaston contends that the trial court erred by denying his
application for a writ of habeas corpus and special plea of double jeopardy. He contends that the
forfeiture placed him in jeopardy and thereby foreclosed the subsequent prosecution.

 The framework of our discussion was altered greatly after briefing and oral
argument by the United States Supreme Court's opinion in United States v. Ursery, U.S.    ,
116 S. Ct. , 135 L.Ed.2d 549 (1996). (1) The Supreme Court held that property used to facilitate
crimes could be civilly forfeited without causing jeopardy to attach; thus, prosecution and related
forfeitures may occur without either creating a double-jeopardy bar to the other. Id. at 571. 
Though the Supreme Court did not explicitly overrule any decision of this Court, its interpretation
of its precedent in Ursery differs greatly from the understanding of that same precedent this Court
expressed in Ex parte Ariza, 913 S.W.2d 215 (Tex. App.--Austin 1995, pet. filed). Compare id.
with Ursery, 135 L. Ed. 2d 549. These differences require us to reexamine the Texas forfeiture
statute (Tex. Code Crim. Proc. Ann. arts. 59.01-59.11 (West Supp. 1996)) and our holding that
forfeitures thereunder were punitive and created jeopardy that barred subsequent prosecutions for
the underlying offense. See Ariza, 913 S.W.2d at 222-23.

 In Ursery, the Supreme Court decided two cases. In one case, the United States
settled a forfeiture action against a house that contained marijuana residue and a grow light, then
prosecuted the settlor for marijuana production. Id. at 557. In the second case, the United States
obtained convictions of two men for conspiracy to launder money and to aid and abet the
manufacture of methamphetamine, then obtained forfeiture of various items used to facilitate those
offenses. Id. at 557-58. In both cases, the appellate courts held that the second actions (criminal
prosecution in the first case, forfeiture in the second) violated the constitutional protection against
double jeopardy. See U.S. Const. amend. 5. The Supreme Court reversed both appellate court
decisions, holding that the forfeitures were neither punishment nor criminal for the purposes of
the double jeopardy analysis. Ursery, 135 L. Ed. 2d at 571.

 The Supreme Court outlined a two-part test for whether jeopardy attached during
a forfeiture proceeding. Id. at 568. If civil, we must first decide whether the legislature intended
the forfeiture proceeding to be criminal or civil. Id. We must then decide whether the proceeding
was so punitive in form and effect that the forfeiture proceeding was criminal despite the
legislature's contrary intent. Id.

 Part one requires objective analysis of the procedural mechanisms. See id. The
Texas legislature intentionally cloaked the forfeiture proceeding in civil trappings despite placing
the statute in the Code of Criminal Procedure. Service of process (with specific exceptions),
pleading, and trial are conducted as in "other civil" cases. See Tex. Code Crim. Proc. Ann. art.
59.04(b), (i) (West Supp. 1996) (service of process); Art. 59.05 (pleading and trial). The
legislature plainly expressed a nonpunitive intent by stating that "asset forfeiture is remedial in
nature and not a form of punishment." Art. 59.05(e); but see Ariza, 913 S.W.2d at 223 (quoting
legislative history stating that statute would "increase the punishment of criminals"). The
legislature intended that forfeiture be a proceeding independent of and parallel to the criminal
proceedings. See Art. 59.05(d) (final conviction not required for forfeiture; dismissal or acquittal
in criminal prosecution only raises rebuttable presumption against forfeiture). The legislature
intended to create a remedial, civil forfeiture proceeding.

 Under part two of the test, we must determine whether appellant established by the
clearest proof that the legislature provided a sanction so punitive as to transform its intended civil
remedy into a criminal penalty. Ursery, 135 L. Ed. 2d at 569. The Supreme Court wrote that
"in rem civil forfeiture has not historically been regarded as punishment." See id. at 570. The
Supreme Court did not set out how punitive the effect would have to be to overcome the stated
civil, remedial intent, but instructed that we can consider forfeiture statutes remedial even if they
have some punitive effects. Id. at 569. The Supreme Court found that forfeiture would encourage
property owners to ensure that their property was not used for crime. Id. at 569-70. The
Supreme Court also wrote that forfeiture serves a deterrent purpose apart from any punitive
purpose. Id. at 570. Forfeiting Gaston's truck has the remedial effect of ensuring that he will not
use it for criminal purposes again. Further, his absence as a party and failure to appear made the
forfeiture hearing essentially an in rem proceeding, thus enhancing the non-punitive nature of the
proceeding. We do not find the "clearest proof" that the proceeding's punitive nature
overwhelmed the legislature's stated intent that the forfeiture be remedial. We find that the
forfeiture proceeding below was no more punitive and criminal than the forfeiture proceedings in
Ursery that the Supreme Court found not to be criminal proceedings. We overrule point four.


No harmful error in admitting hearsay


 Gaston objected to the admission of the following testimony regarding statements
made by Valita. One witness testified Valita said that Gaston was angry with Valita and had told
her that he was going to shoot her. A second witness testified that Valita said there were
problems at home and that Gaston had threatened to shoot her. A third witness testified that
Valita said that Gaston did not like her working at garage sales, did not like her tithing practices,
was angry with her, and had started out toward a trailer where they kept a gun.

 Other evidence of Gaston's guilt obviates a discussion of the correctness of the trial
court's decision to allow these hearsay statements. Gaston and Valita had a troubled marriage and
were undergoing counseling. He had been upset with Valita for some time; he told their marriage
counselor that he (Gaston) was "going to hell and was taking someone with him" (implying
Valita); and, on the day of the murder, he had his will notarized and gave his son papers for
safekeeping. It is undisputed that he walked calmly into the fellowship hall, pointed the gun at
his wife's head, and fatally shot her. As he was wrestled to the ground, he shouted, "I'll send her
to hell." When the man who restrained him said he ought to kill Gaston, Gaston replied, "Go
ahead and kill me," substantiating the murder-suicide plan. Gaston told one of his subduers that
he was not crazy, that he knew what he had done, but that Valita had hurt him. Gaston admitted
at trial that the killing was "no thirty minute deal."

 In light of the overwhelming evidence of guilt, we can say beyond a reasonable
doubt that any error in the admission of the hearsay statements did not contribute to the conviction
or punishment. There is no reversible error. Tex. R. App. P. 81(b)(2). We overrule point three.


No error in refusing to give instructions


 Gaston contends that the court should have charged the jury on the lesser-included
offenses of voluntary manslaughter and involuntary manslaughter. A court must charge the jury
on a lesser offense in addition to the charged offense if (1) proof of the lesser offense is included
within the proof necessary to establish the offense charged and (2) some evidence exists in the
record that would permit a jury rationally to find the defendant guilty, if at all, of only the lesser
offense. Rousseau v. State, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993). Because the State
concedes that both offenses are lesser-included offenses of murder, we will analyze only under
the second prong.

 We first set out the elements of the offenses under the applicable statutes. (2) Murder
occurs if a person intentionally or knowingly causes the death of an individual. Act of May 28,
1973, 63d leg., R.S., ch. 426, art. 2, sec. 1, § 19.02(a)(1), 1973 Tex. Gen. Laws 1122, 1123. (3) 
Voluntary manslaughter occurs if a person murders while under the "immediate influence of
sudden passion arising from an adequate cause." Id. at 1124 (§ 19.04(a)). (4) Involuntary
manslaughter occurs when a person recklessly causes the death an individual. Id. (§ 19.05(a)(1)). (5)

 The legislature defined the elements of voluntary manslaughter that distinguished
it from murder. Id. (§ 19.04(b), (c)). (6) Sudden passion was "passion directly caused by and
arising out of provocation by the individual killed . . . which passion arises at the time of the
offense and is not solely the result of former provocation." Adequate cause was "cause that would
commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper,
sufficient to render the mind incapable of cool reflection."

 Gaston contends that his testimony raised the elements of voluntary manslaughter. 
He spent the morning of the killing futilely trying to repair an air conditioner on a camper so that
he and Valita could spend the weekend in it. Valita nagged and taunted him regarding his
inability to complete tasks and about an invention of his. She then told him she was moving out. 
She left after they talked about dividing their property, in which she included the house he had
owned with a deceased former wife. He testified that he then went blank or into a trance, stopped
thinking, felt hurt and angry, and lost control of himself. He said he felt like the devil took
control of him until he heard the gunshot that killed Valita. On appeal, he contends that this
period of "demonic possession" eliminated any opportunity for cool reflection from the time Valita
left the house until he killed her. We reject his contention.

 Even under his version of events, Valita did nothing adequate to cause the requisite
degree of emotion in a person of ordinary temper. We grant that nagging, taunting, and
promising a divorce and property squabble can be very unpleasant actions. Gaston's counsel
artfully argues that Gaston's description of demonic possession is the way an elderly, "hyper-religious" man would describe resultant overwhelming anger, rage, and resentment. His age and
religiosity, however, do not excuse him from the legal standard. The evidence did not describe
a scenario that would render a person of ordinary temper incapable of cool reflection.

 Even if Valita's actions had provided adequate cause for his sudden passion, Gaston
did not act immediately under the influence of that passion. The passage of about an hour
between their argument and the killing shows that whatever caused him to kill Valita did not arise
"at the time of the offense." The evidence showed no provocative action by her at the church
fellowship hall where he killed her. Despite his argument that possession by the demons of rage
debilitated him from cool reflection, we find no basis to hold that such demonic possession tolls
the running of the "immediate influence" period for an hour. Voluntary manslaughter is a limited
exception to the murder statute; we will not stretch the limitations requiring immediacy and
suddenness to encompass this man whose passion had ample time to subside over the course of
the hour as he found his gun, got in his truck, drove to the church, walked into the church, and
talked briefly to the churchmembers before pulling out his gun and killing his wife. The court
did not err by refusing the voluntary manslaughter instruction. We overrule point one.

 Gaston's argument for an involuntary manslaughter instruction likewise fails. The
critical distinction from murder is that, instead of intending death or serious injury, the killer must
merely have been reckless about whether his actions could cause death. People are reckless when
they are aware of but consciously disregard a substantial and unjustifiable risk that a result will
occur. Tex. Penal Code Ann. § 6.03(c) (West 1994) (unchanged by recodification). Gaston
conceded that he knew how the gun worked, including the safety, and the danger the gun posed. 
He denied that he had any specific intent to kill his wife. Though he stated that the gun just went
off, he explained that "that hand done it but I didn't." We do not find support for body parts
having intent independent from the remainder of the body and mind. Further, the hand did not
act alone. The rest of the body got him out of the house and into the truck, drove across town
to the church, and walked into the fellowship hall. The rest of the body got his hand into the
position that it could point the gun directly at Valita's head from close range and pull the trigger. 
The mouth, which had made thinly veiled threats to send Valita to hell, said, "I'll send her to hell"
after shooting her. Though the jury might have found that he did not intend to kill Valita, such
a finding would have required acquittal. The evidence showed only focused, purposeful action
without a hint of recklessness. The court did not err by refusing the involuntary manslaughter
instruction. We overrule point two.

 Having overruled all points of error, we affirm the judgment.


Before Justices Powers, Jones and B. A. Smith

Affirmed

Filed: August 28, 1996

Publish

1.   All pinpoint cites will be to Lawyers Edition, 2d.
2.   The Penal Code was revised after Gaston killed Valita. We will set out the then-applicable statutes in the text and briefly discuss in footnotes the nature of the revisions.
3.   The wording of the old statute cited in the text is the same as the current statute,
codified at Tex. Penal Code Ann. § 19.02(b)(1) (West 1994).
4.   Sudden passion arising from adequate cause can now be raised only as an
affirmative defense or mitigating circumstance at the punishment phase to reduce the
degree of the felony and the punishment range. See Tex. Penal Code Ann. § 19.02(d)
(West 1994).
5.   The legislature dropped the word "involuntary" from this offense, codifying the
offense of "manslaughter" at Tex. Penal Code Ann. § 19.04(a) (West 1994).
6.   These definitions are recodified at Tex. Penal Code Ann. § 19.02(a)(1), (2) (West
1994).


taunting, and
promising a divorce and property squabble can be very unpleasant actions. Gaston's counsel
artfully argues that Gaston's description of demonic possession is the way an elderly, "hyper-religious" man would describe resultant overwhelming anger, rage, and resentment. His age and
religiosity, however, do not excuse him from the legal standard. The evidence did not describe
a scenario that would render a person of ordinary temper incapable of cool reflection.

 Even if Valita's actions had provided adequate cause for his sudden passion, Gaston
did not act immediately under the influence of that passion. The passage of about an hour
between their argument and the killing shows that whatever caused him to kill Valita did not arise
"at the time of the offense." The evidence showed no provocative action by her at the church
fellowship hall where he killed her. Despite his argument that possession by the demons of rage
debilitated him from cool reflection, we find no basis to hold that such demonic possession tolls
the running of the "immediate influence" period for an hour. Voluntary manslaughter is a limited
exception to the murder statute; we will not stretch the limitations requiring immediacy and
suddenness to encompass this man whose passion had ample time to subside over the course of
the hour as he found his gun, got in his truck, drove to the church, walked into the church, and
talked briefly to the churchmembers before pulling out his gun and killing his wife. The court
did not err by refusing the voluntary manslaughter instruction. We overrule point one.

 Gaston's argument for an involuntary manslaughter instruction likewise fails. The
critical distinction from murder is that, instead of intending death or serious injury, the killer must
merely have been reckless about whether his actions could cause death. People are reckless when
they are aware of but consciously disregard a substantial and unjustifiable risk that a result will
occur. Tex. Penal Code Ann. § 6.03(c) (West 1994) (unchanged by recodification). Gaston
conceded that he knew how the gun worked, including the safety, and the danger the gun posed. 
He denied that he had any specific intent to kill his wife. Though he stated that the gun just went
off, he explained that "that hand done it but I didn't." We do not find support for body parts
having intent independent from the remainder of the body and mind. Further, the hand did not
act alone. The rest of the body got him out of the house and into the truck, drove across town
to the church, and walked into the fellowship hall. The rest of the body got his hand into the
position that it could point the gun directly at Valita's head from close range and pull the trigger. 
The mouth, which had made thinly veiled threats to send Valita to hell, said, "I'll send her to hell"
after shooting her. Though the jury might have found that he did not intend to kill Valita, such
a finding would have required acquittal. The evidence showed only focused, purposeful action
without a hint of recklessness. The court did not err by refusing the involuntary manslaughter
instruction. We overrule point two.

 Having overruled all points of error, we affirm the judgment.


Before Justices Powers, Jones and B. A. Smith

Affirmed

Filed: August 28, 1996

Publish

1.   All pinpoint cites will be to Lawyers Edition, 2d.
2.   The Penal Code was revised after Gaston killed Valita. We will set out the then-applicable statutes in the text and briefly discuss in footnotes the nature of the revisions.
3.   The wording of the old statute cited in the text is the same as the current statute,
codified at Tex. Penal Code Ann. § 19.02(b)(1) (West 1994).
4.   Sudden passion arising from adequate cause can now be raised only as an
affirmative defense or mitigating circumstance at the punishment phase to reduce the
degree of the felony and the punishment range. See Tex. Penal Code Ann. § 19.02(d)
(West 1994).
5.   The legislature dropped the word "involuntary" from this offense, codifying the
offense of "manslaughter"